# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

RESIDENTIAL FUNDING COMPANY,
LLC,

Court File No. 13-cv-03485 (SRN/TNL)

Plaintiff,

**PLAINTIFF'S FIRST AMENDED
COMPLAINT**

v.

PROVIDENT FUNDING ASSOCIATES,
L.P.,

Defendant.

Plaintiff Residential Funding Company, LLC f/k/a Residential Funding Corporation ("RFC" or "Plaintiff"), by and through its attorneys, alleges for its First Amended Complaint against defendant Provident Funding Associates, L.P. ("Provident" or "Defendant"), as follows:

### NATURE OF ACTION

1.     This case arises in substantial part from the billions of dollars in liabilities and losses incurred by Plaintiff RFC in and pursuant to its chapter 11 bankruptcy case in the United States Bankruptcy Court for the Southern District of New York (Case No. 12-12020 (MG)).  Those liabilities and losses, in turn, arose from defective residential mortgage loans sold to RFC by mortgage loan sellers, including Defendant Provident, who are legally and contractually responsible for the liabilities and losses caused by the poor quality of the mortgage loans in question.

606519.1

2.      Plaintiff RFC was, at times prior to its bankruptcy in May 2012, in the business of acquiring and securitizing residential mortgage loans.

3.      RFC's business model was built on acquiring loans from "correspondent lenders," such as Provident, and distributing those loans by either pooling them together with other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts, or selling them to whole loan purchasers.

4.      Over the course of the parties' relationship, Provident sold over 6,900 mortgage loans, with an original principal balance in excess of $2.6 billion, to RFC.

5.      Critical to RFC's business success was the quality of the loans it purchased. To that end, RFC required its correspondent lenders, including Provident, to abide by stringent loan-level contractual representations and warranties designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans it purchased.

6.      Over the course of RFC's business relationship with Provident, RFC identified loans that contained material defects violating one or more of Provident's contractual representations and warranties, and Provident in many cases acknowledged those material defects by repurchasing the loans or otherwise compensating RFC for the defects.  To the extent Provident repurchased certain individual loans from RFC, RFC is not seeking to again recover the repurchase price as to those loans.  However, many defective loans sold to RFC by Provident remain unresolved. Moreover, Provident's repurchase of certain loans did not compensate RFC for all the liabilities and losses that

2

RFC incurred due to Provident's sale of defective loans to RFC.  The parties' Agreement entitles RFC to recovery of the additional liabilities and losses it incurred due to Provident's breaches.

7.      Ultimately, due in significant part to the failure of correspondent lenders, including Provident, to honor their contractual representations and warranties, RFC was sued by numerous counterparties and investors in its RMBS, based on allegations that the loans contained numerous defects and were rife with fraud and compliance problems.

8.      By the time RFC and certain of its affiliates (collectively, the "Debtors") filed for bankruptcy in May 2012, RFC was facing over two dozen lawsuits around the country, all alleging that the loans RFC had securitized were defective, as well as claims by investors in hundreds of its RMBS seeking tens of billions of dollars in damages based on loan-level problems.

9.      During the bankruptcy proceeding, hundreds of proofs of claim were filed by dozens of claimants, including investors alleging securities fraud claims, class action plaintiffs, monoline insurers, RMBS holders and indenture trustees acting at their direction claiming breaches of representations and warranties, whole loan investors, and non-debtor co-defendants (such as underwriters of the RMBS offerings).  Collectively, these claims alleged tens of billions of dollars of damages stemming from defective loans, including those sold to RFC by Provident.

10.     Following a lengthy and intensive mediation presided over by sitting bankruptcy judge James M. Peck, and related proceedings, RFC was able to resolve its RMBS-related liabilities for over $10 billion of allowed claims in its bankruptcy case.

This agreed resolution of RFC's RMBS-related liabilities was set forth in a global settlement, which formed the cornerstone of a liquidating chapter 11 plan for RFC and its affiliated Debtors.  On December 11, 2013, after a five-day confirmation trial, the Bankruptcy Court approved the global settlement, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the chapter 11 plan.

11.    Defendant Provident is contractually obligated to indemnify RFC for all liabilities and losses incurred by RFC as a result of breaches of Defendant's representations and warranties.

12.    Accordingly, RFC brings this action for breach of contract, and for indemnification of all liabilities and losses RFC has incurred due to Defendant's breaches of its representations and warranties.

## PARTIES

13.    Plaintiff RFC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.  RFC was formerly known as Residential Funding Corporation.  When this case was commenced, RFC was a wholly owned subsidiary of GMAC-RFC Holding Company, LLC, a Delaware limited liability company.  GMAC-RFC Holding Company, LLC was a wholly owned subsidiary of Residential Capital, LLC, a Delaware limited liability company.  Residential Capital, LLC was a wholly owned subsidiary of GMAC Mortgage Group LLC, a Delaware limited liability company, which in turn was a wholly owned subsidiary of Ally Financial, Inc., a Delaware corporation with its principal place of business in Michigan. Pursuant to the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital,*

*LLC, et. al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan"), on December 17, 2013, GMAC-RFC Holding Company, LLC's interest in RFC was cancelled and the ResCap Liquidating Trust (the "Trust") succeeded to all of RFC's rights and interests under RFC's Agreement with Provident, and now controls RFC.[1]

14.     Defendant Provident is a California limited partnership with its principal place of business at 851 Traeger Avenue, Suite 100, San Bruno, CA 94066.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, in that the matter arises under title 11 or arises in or is related to the bankruptcy proceeding. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

16.     As set forth in Plaintiff RFC's pending motion to transfer, venue is most appropriate in the United States Bankruptcy Court for the Southern District of New York, because these claims relate to the bankruptcy of Plaintiff RFC and certain of its affiliates already pending in that court as Case No. 12-12020 (MG).  Should RFC's motion to transfer be denied, however, venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because, among other things, the parties have contractually agreed that Minnesota is an appropriate venue.

---

[1]     The Trust is organized pursuant to the Delaware Statutory Trust Act.

## FACTUAL BACKGROUND

### The Agreement Between RFC and Provident

17.    Over the course of the parties' relationship, Provident sold over 6,900 mortgage loans to RFC pursuant to the Seller Contract attached as Exhibit A (the "Contract").

18.    The Contract incorporates into its terms and conditions the RFC Client Guide, exemplary excerpts of which are attached as Exhibit B-1 through B-15 (the "Client Guide").  (The complete versions of the Client Guide are known to the parties and too voluminous to attach in their entirety; the omitted portions of the Client Guides do not affect the obligations set forth in this Amended Complaint.)  The Contract and Client Guide collectively form the parties' Agreement, and set the standards to which Provident's loans sold to RFC were expected to adhere.

19.    A preliminary list of the loans sold by Provident to RFC pursuant to the Agreement, and subsequently securitized by RFC, is attached hereto as Exhibit C.  The original principal balance of these loans exceeds $2.6 billion.

20.    As a correspondent lender, Provident had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan.  Provident had primary responsibility for all aspects of the underwriting of the loan, and it was understood between the parties that RFC would generally *not* be re-underwriting the loan.  It was Provident, or others from whom Provident purchased mortgages, that actually closed the loans with the borrowers.

21.     As Provident was well aware, once the loans were sold to RFC, RFC pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization Trust.  The pool of loans formed the collateral underlying the Trust's mortgage-backed securities, which were in turn sold to investors.

22.     As Provident was also well aware, RFC from time to time sold pools of loans to whole loan investors.

23.     Provident knew of RFC's intention to securitize and/or sell the loans. Specifically, Defendant Provident acknowledged, in the Client Guide, that it "recognize[d] that it is [RFC's] intent to securitize some or all of the Loans sold to [RFC]," and agreed to provide RFC with "all such information … as may be reasonably requested by [RFC] for inclusion in a prospectus or private placement memorandum published in connection with such securitization," including all information necessary to comply with the disclosures required by Regulation AB (governing asset-backed securities) and other applicable federal securities laws.  (See Client Guide at A202(II); 206(D).)

24.     Pursuant to the Agreement, Defendant Provident made a number of representations and warranties with respect to the loans, including, but not limited to, the following:

> a. Defendant's "origination and servicing of the Loans have been legal, proper, prudent and customary and have conformed to the highest standards of the residential mortgage origination and servicing business." (Client Guide A201(K).)
>
> b. Defendant "will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify GMAC-RFC of any

occurrence, act, or omission regarding [Defendant], the Loan, the Mortgaged Property or the Mortgagor of which [Defendant] has knowledge, which … may materially affect [Defendant], the Loan, the Mortgaged Property or the Mortgagor." (Client Guide A201(M).)

c. "All information relating to each Loan delivered and sold to GMAC-RFC is true, complete and accurate and there are no omissions of material facts. All data provided by the Client to GMAC-RFC relating to any Loan, whether in electronic format, or otherwise, is true and complete and accurately reflects the information in the related Loan file." (Client Guide A202(A).)

d. "All Loan Documents, Funding Documents and Final Documents are genuine, have been completed, duly and properly executed, are in recordable form and delivered in the form and manner specified in this Client Guide," and "[a]ll originals and copies of such documents and all other documents, materials, and other information required to be submitted to GMAC-RFC have been so submitted, and are complete and accurate." (Client Guide A202(D).)

e. "All Loan Documents, Funding Documents and Final Documents and all other documents describing or otherwise relating thereto are in compliance with all local and State laws, regulations and orders." (Client Guide A202(D).)

f. "There is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to GMAC-RFC, and no event exists which, with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by [Defendant] or any other entity involved in originating or servicing the Loan." (Client Guide A202(G).)

g. "[E]ach Loan has been originated, closed, and transferred in compliance with all applicable local, State and federal laws and regulations, including, but not limited to, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Truth-in-Lending Act, the Fair Housing Act, and the National Flood Insurance Act. This warranty is made by [Defendant] with respect to each GMAC-RFC Loan Application taken and processed for each Loan and with respect to each Loan made by the [Defendant] or any other entity." (Client Guide A202(I).)

h. "No Loan is a ... loan considered a 'high-cost,' covered, 'high-risk,' 'predatory' or any other similar designation under any State or local law in effect at the time of the closing of the loan if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees." (Client Guide A202(J)(1)(d).)

i. "[N]o circumstances exist involving the Loan Documents, the Mortgaged Premises or the Borrower's credit standing that could: (i) cause private institutional investors to regard the Loan as an unacceptable investment, (ii) cause the Loan to become delinquent, or (iii) adversely affect the Value or marketability of the Mortgaged Premises or the Loan." (Client Guide A202(Q).)

j. "The Loan is of investment quality, has been prudently originated and has been underwritten in compliance with all requirements of this Client Guide." (Client Guide A202(T).)

k. "For each Loan for which an appraisal is required or obtained under this Client Guide, the appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in this Client Guide." (Client Guide A202(T).)

l. "For each Loan, as of the Funding Date, the market Value of the Mortgaged Premises is at least equal to the appraised value stated on the Loan appraisal, or if an Automated Valuation Model (AVM) is permitted, the Value on the AVM, except to the extent that the market Value of the Mortgaged Premises is lower ... due to the effect of any toxic materials or other environmental hazards of which neither the appraiser nor the [Defendant] has actual knowledge of reasonable grounds to suspect." (Client Guide A202(T).)

m. "No fraud or misrepresentation by the Borrower or by the [Defendant], broker, correspondent, appraiser or any independent contractor retained by the [Defendant], broker, correspondent, appraiser or any employee of any of the foregoing occurred with respect to or in connection with the origination or underwriting of any Loan and all information and documents provided to GMAC-RFC in connection with the Loan are complete and accurate." (Client Guide A202(KK).)

25.  These representations and warranties were material terms in RFC's agreement to acquire the mortgage loans from Provident. Provident's contractual

warranty of the quality of the loans was important because RFC in turn sold these loans to RMBS trusts and whole loan purchasers, making its own representations and warranties to the trusts and investors.   If any of Provident's representations and warranties turned out to be false, RFC could have exposure to these third parties, and thus RFC required contractual protection from Provident under which RFC would have recourse for its liabilities and losses on account of defective loans.

26.   Pursuant to the Client Guide, Provident's failure to comply with its representations and warranties or <u>any</u> of the other requirements, terms or conditions of the Client Guide constitutes an "Event of Default," as does its failure to provide RFC with true, accurate and complete information in a timely manner.   (<u>See</u> Client Guide A208.)

27.   Similarly, it is an "Event of Default" if a "[b]orrower or any other person or entity involved in the loan transaction or its underwriting or documentation (including any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with" the loan transaction, regardless of whether Provident knew of the misrepresentation or incorrect information. (<u>See</u> Client Guide A208.)

28.   Provident expressly agreed that RFC was permitted to exercise any remedy "allowed by law or in equity" in connection with such Events of Default.   (<u>See</u> Client Guide A209.)  Moreover, the Client Guide specified that RFC's exercise of one or more remedies in connection with a particular Event of Default "will not prevent it from

exercising … [o]ne or more other remedies in connection with the same Event of Default," or "[a]ny other rights which it may have at law or in equity." (<u>Id.</u>)  RFC's remedies expressly survived the sale of the loans and the termination of the ongoing business relationship between RFC and Provident.  (<u>Id.</u> at A209(C).)

29.      The Client Guide further specified the remedies available to RFC in case of an Event of Default, including a breach of any loan-level representation or warranty.  The available remedies included, but were expressly not limited to, repurchase of the defective loan, substitution of another loan for the defective one, or indemnification against liabilities resulting from such breaches.  (<u>See</u> Client Guide A210.)  The Client Guide expressly stated that RFC was "not required to demand repurchase within any particular period of time, and may elect not to require immediate repurchase."  (<u>Id.</u>)  Further indemnification remedies are set forth in Sections A202 and A212 of the Client Guide.  Section A209 of the Client Guide, in turn, makes clear that all of these remedies are non-exclusive and cumulative.

30.      Moreover, RFC alone retained the sole discretion to declare an Event of Default, and to choose what remedy or remedies to pursue.  Nothing in the Agreement required RFC to provide Provident with notice and an opportunity to cure the defects, to make a repurchase demand, or in any way restricted RFC from pursuing recovery for materially defective loans at any time.  In fact, the United States Court of Appeals for the Eighth Circuit recently confirmed that, under the Client Guide, RFC has the sole discretion to declare an Event of Default, and correspondent lenders such as Provident have contractually bargained away any right to challenge RFC's determination regarding

such an Event of Default.  See Residential Funding Co., LLC v. Terrace Mortg. Co., 725
F.3d 910 (8th Cir. 2013).

31.     The repurchase provision required Provident to compensate RFC for
defective loans according to a formula specified in the Client Guide that is based on the
original principal balance of the loan.   If RFC determined that repurchase was not
appropriate, Provident would nonetheless contractually be obligated to pay RFC "all
losses, costs and expenses incurred by [RFC] and/or the loan's servicer as a result of an
Event of Default," including "all reasonable attorneys' fees and other costs and expenses
incurred in connection with enforcement efforts undertaken."  (See Client Guide A210.)

32.     Under the terms of the Agreement, Provident is obligated to repurchase
loans and/or pay RFC the repurchase price even if the loan has already been foreclosed
upon.  (See Client Guide A210(B).)

33.     Defendant Provident also expressly agreed to broad indemnification
provisions, including the following:

> [Defendant] shall indemnify GMAC-RFC from all losses, damages,
> penalties, fines, forfeitures, court costs and reasonable attorneys'
> fees, judgments, and any other costs, fees and expenses …
> includ[ing], without limitation, liabilities arising from (i) any act or
> failure to act, (ii) any breach of warranty, obligation or
> representation contained in the Client Guide, (iii) any claim,
> demand, defense or assertion against or involving GMAC-RFC
> based on or resulting from such breach, (iv) any breach of any
> representation, warranty or obligation made by GMAC-RFC in
> reliance upon any warranty, obligation or representation made by
> [Defendant] contained by the Client Contract and (v) any untrue
> statement of a material fact, omission to state a material fact, or false
> or misleading information provided by the [Defendant] in
> information required under Regulation AB or any successor
> regulation.

>    In addition, [Defendant] shall indemnify GMAC-RFC against any
>    and all losses, damages, penalties, fines, forfeitures, judgments, and
>    any other costs, fees and expenses (including court costs and
>    reasonable attorneys' fees) incurred by GMAC-RFC in connection
>    with any litigation or governmental proceeding that alleges any
>    violation of local, State or federal law by [Defendant], or any of its
>    agents, or any originator or broker in connection with the origination
>    or servicing of a Loan.

(Client Guide A212.)  Provident further agreed:

>    to indemnify and hold GMAC-RFC harmless from and against any
>    loss, damage, penalty, fine, forfeiture, court cost, reasonable
>    attorneys' fees, judgment, cost, fee, expense or liability incurred by
>    GMAC-RFC as a result of any material misstatement in or omission
>    from any information provided by [Defendant] to GMAC-RFC; or
>    from any claim, demand, defense or assertion against or involving
>    GMAC-RFC based on or grounded upon, or resulting from such
>    misstatement or omission or a breach of any representation, warranty
>    or obligation made by GMAC-RFC in reliance upon such
>    misstatement or omission.

(Client Guide A202.)   The Client Guide also entitles RFC to recover all court costs,

attorney's fees and any other costs, fees and expenses incurred by RFC in enforcing the

Agreement or Client Guide.

34.    Additionally, prior to the commencement of this lawsuit, Provident

conceded that certain of its loans sold to RFC were materially defective.  In that regard,

Provident has already paid substantial sums to RFC to cover those defects.  In this action,

RFC is not seeking to recover again on those sums.

35.    RFC at all times performed all of its obligations to Provident, if any, under

the Agreement, and all conditions precedent to the relief sought in this action, if any,

have been satisfied.

## **Defendant Materially Breached Numerous Loan-Level Representations and Warranties**

36.     As noted above, the loans RFC acquired from Provident and other correspondent lenders were sold, either into RMBS trusts that issued certificates to outside investors, or in "whole loan" portfolios to other mortgage companies and banks.

37.     The loans Provident sold RFC were eventually deposited in over 160 RMBS Trusts.   When RFC sold the loans, it passed on a more limited set of representations and warranties to the Trusts, and, as required by SEC regulations, disclosed pertinent information about the loans to investors in the RMBS.   In making those representations and warranties, RFC relied on information provided to it by Provident and other correspondent lenders.   That information in many cases violated Provident's representations and warranties to RFC.

38.     Provident materially breached its extensive contractual representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

39.     The Trust, on behalf of RFC, undertook an investigation to examine Provident's representations and warranties about the subject properties' appraised values and owner-occupancy status using an automated-valuation model ("AVM") and borrowers' tax records (together, the "Forensic Review").

40.     AVM is a tool in the mortgage industry that considers objective criteria such as the sale prices of comparable properties, previous surveyor valuations, historical

house price movements and user inputs (number of bedrooms, property improvements, etc.) in the same locale as the subject property to determine the true market value of the property in question at a specific point in time.

41.     Using the same comparable sales data that would have been available to Provident at the time of origination, the AVM review first conducted retroactive appraisals of the properties backing a random sample of eighty-five (85) of the loans Provident sold to RFC.  The AVM review centered on three of Provident's core appraisal representations: (i) the market value of the mortgaged premises is at least equal to the appraised value stated in the loan appraisal (Client Guide A202(T)); (ii) no fraud or misrepresentation by the appraiser occurred in the origination of the loans and all information and documents provided to RFC in connection with the loans are complete and accurate (Client Guide A202(KK)); and (iii) all data provided by Provident to RFC relating to any loan are true and complete (Client Guide A202(A)).

42.     Among other findings, the AVM review concluded of the sampled Provident loans that:

- 43% had reported property values overrepresented by more than 10%;

- 33% had reported property values overrepresented by more than 15%;

- Nearly 33% had reported loan-to-value ("LTV")[2] ratios underrepresented by more than 10%;

---

[2]  The LTV ratio is a key measure of a borrower's likelihood to default.  The LTV ratio expresses the amount of the mortgage loan as a percentage of the total appraised value of the property.  For example, if a borrower borrows $80,000 to buy a house worth $100,000, then the LTV ratio is $80,000/$100,000, or 80%—the remaining $20,000 of the house's value reflect the borrower's 20% equity stake in the house.  A combined

- Nearly 23% had reported LTV ratios underrepresented by more than 15%;

- 12% had reported LTV ratios underrepresented by more than 25%; and

- Nearly 13% of the loans had actual LTV ratios greater than 100% (*i.e.*, the loans were "underwater" at origination).

43.     All of these findings establish breaches of at least the following representations: (A), (T), and (KK) of Section A202 of the Client Guide.

44.     The Forensic Review also investigated Provident's representations as to the owner-occupancy status of the loans Provident sold to RFC. A property is said to be "owner-occupied" when the borrower has made the property his primary residence, as opposed to a vacation home or investment property. When a property is not in fact owner-occupied, the borrower is more likely to default, which in turn increases the riskiness of the mortgage loan. Borrowers who live in mortgaged properties are known to be less likely to "walk away" from those properties and default on their mortgage obligations than borrowers who buy residential properties as investments or as vacation homes.

45.     The owner-occupancy review centered on Provident's representations that: (i) all information provided to RFC relating to each loan is true, complete, and accurate, and there are no omissions of material facts (Client Guide A202(A)); (ii) there is no default, breach, violation, or event of acceleration existing under any mortgage note

---

loan-to-value ratio (or "CLTV" ratio) expresses the amount of all of the loans secured by a property as a percentage of that property's appraised value; that is, it accounts for any additional liens. A borrower with a sizable equity stake in a property has more to lose than a borrower with a small stake; thus, a borrower with a large equity position has financial incentives not to default and lose his or her equity. Conversely, a borrower with little or no equity stake in a property has little financial incentive to avoid default.

(Client Guide A202(G)); and (iii) there was no fraud or misrepresentation by the borrower, broker, or Provident in the origination of the loan (Client Guide A202(K)).

46.     The owner-occupancy review ran two tests to determine the accuracy of Provident's representations as to the owner-occupancy of the properties collateralizing the loans sold to RFC.  The first test investigated where the borrower had their tax bills sent.  It is reasonable to expect that a borrower residing at a property would have their tax bills sent to that address.  If a borrower had his or her tax records sent to another address, the owner-occupancy review regarded that as evidence that the borrower did not actually reside at the mortgaged property.  The second test assessed whether the borrower made certain tax exemptions based on the property.  If a borrower declined to make tax exemption elections that depend on the borrower living at the property, that is also strong evidence that the borrower was living elsewhere.  If a loan failed both of these tests, the owner-occupancy review identified a breach of representations (A), (G), and (KK) of Section A202 of the Client Guide.

47.     Of the sampled loans, 41% failed both owner-occupancy tests and therefore breached representations (A), (G), and (KK) of Section A202 of the Client Guide.

48.     Over time, many of the loans sold to RFC by Provident defaulted or became seriously delinquent.  In the aggregate, the loans sold to RFC by Provident and securitized by RFC sustained more than $187.5 million in losses, exposing RFC to claims from investors, monoline insurers, and others.

49.     These delinquency and default rates exceed what would normally be expected in a given population of mortgage loans.

50.     Internal reviews conducted by RFC determined that numerous loans sold to RFC by Provident violated the Client Guide and/or other representations or warranties made by Provident, resulting in an Event of Default under the Agreement.

51.     The types of defects varied, but included income misrepresentation, employment misrepresentation, insufficient credit scores, owner occupancy misrepresentations, appraisal misrepresentations or inaccuracies, undisclosed debt, and missing or inaccurate documents, among others.  Additional material defects are likely contained throughout the loan population sold to RFC by Provident.  Indeed, a number of the loans defaulted very shortly after origination (constituting Early Payment Defaults or EPDs), which is widely recognized in the industry as often signaling fraud or other problems in the origination and underwriting of the loans.

52.     By way of example, the following loans sold to RFC by Provident were identified as having significant and material defects violating the Client Guide representations and warranties:

      a.  Loan ID # 1913569 – There were numerous material breaches of Provident's representations and warranties to RFC associated with this loan, which defaulted shortly after it was acquired by RFC.  The borrower's credit score was materially lower than that allowed under the applicable underwriting guidelines.  In addition, the loan file did not contain the required 2-year employment history for the borrower, and the tenure of employment represented on the loan application was inaccurate.  Provident's underwriter represented the borrower had 8 years of employment as of March 11, 1999, even though the underwriter noted the borrower's date of hire was October 27, 1997 – which was less than two years.  The borrower had also filed a chapter 7 bankruptcy before the loan was originated, terminated his employment four days after the loan was closed and incurred three additional installment debts before RFC acquired the loan.  The borrower's debt-to-income ratio was also incorrectly calculated and exceeded that allowed by RFC's

standards.  The appraisal of the subject property was inaccurate.  RFC's audit also noted:  "The changes in employment and additional credit debt makes this loan decision unsupportable . . . . The borrower decided to startup his own business and purchased a new vehicle before the loan was acquired by RFC which materially impacted the viability of this loan."

Based on the above, this loan did not meet RFC's standards, was rated "unacceptable" by RFC's internal audit, and materially breached numerous representations and warranties by Provident to RFC.

b.  Loan ID #1910782 – Among the several material errors made by Provident in the origination and selling of this loan to RFC that defaulted shortly after it was acquired were that the loan file failed to contain evidence that the borrower had satisfied thousands of dollars in debts.  In addition, the underwriter of the loan "grossed up the borrower's social security income by 125%, rather than the 115% allowed."  The lower monthly income resulted in an impermissible 54% DTI ratio for the borrower under a loan program that allowed a maximum DTI of 50%.  The appraised value of the subject property was also inflated, resulting in an LTV ratio of 98%.  The audit appraiser noted that the "comps used [for the initial appraisal] were located in superior neighborhoods and closer and more comparable comps were not used."  Distances for the comps also were further than represented by the original appraiser.  All of these errors materially breached the representations and warranties Provident made to RFC.

c.  Loan ID # 10968712 (included in securitization 2007-SA4) – RFC's internal audit of this $365,750 loan acquired by RFC from Provident on June 20, 2007, revealed a web of fraudulent misrepresentations by the borrower to obtain approval for the loan.  RFC's audit concluded (i) the loan was most likely originated as a result of "transaction misrepresentation," (ii) the loan was the product of a non-arm's length transaction, (iii) the borrower misrepresented her intent to occupy the subject property as her primary residence, (iv) the borrower misrepresented her ownership in the property where she actually resided, (v) the Verification of Rent ("VOR") provided by the borrower was fraudulent, and (vi) a 12-month housing payment history was not properly documented as required.  Not surprisingly, the loan defaulted shortly after origination.

As factual support for the above conclusions, RFC's audit noted the borrower represented that she intended to occupy the subject property collateralizing the loan as her primary residence but, in fact, was living

with her husband at another property she owned.  Further, the borrower concealed her ownership in the property where she resided by making repeated interspousal transfers of title between herself and her husband.

Public records and credit reports indicated more fraud. Specifically, the borrower had issued a deed in lieu of foreclosure on the subject property to an Ananeoo Properties on July 5, 2006.  However, the address for Ananeoo Properties was a P.O. Box and street address associated with the borrower herself, as well as another business entity that had no relationship with Ananeoo Properties.  Further, no association could be found between the purported trustee for Ananeoo Properties who signed the Purchase Agreement and Ananeoo Properties.

In addition, the loan file contained no explanation to account for the discrepancy between the address reported on the VOR and the address of residence stated by the borrower at the time the loan was originated.  In fact, a public records search revealed that another individual, not the borrower, owned and occupied the property the borrower had represented as her residence.  The fraudulent VOR was completed by the same purported "trustee" for Ananeoo Properties.

Finally, the borrower stated her income source was that she was the owner of a company when, in reality, her husband (who did not co-sign the loan) owned the company.

Based on the above, the borrower did not qualify for the loan under the applicable RFC underwriting standards, and the loan contained numerous material breaches of Provident's representations and warranties to RFC, rendering it "unacceptable" under RFC's standards.

Provident acknowledged these problems and paid the loss on the loan.  However, the inclusion of this and other defect loans among those sold by Provident to RFC and securitized by RFC exposed RFC to additional liabilities and losses for which Provident has not compensated RFC.

d.  Loan ID # 1907065 – The borrower on this loan fraudulently misrepresented her income and employment.  During RFC's internal audit of this loan, the purported employer confirmed the borrower never was employed there.  Excluding the excess income overstated by the borrower resulted in a real DTI ratio of 63%, which violated RFC's underwriting guidelines.  In addition, the appraised value of the subject property collateralizing the loan was inflated by 45%, rendering the LTV and CLTV ratios 102% and 116%, respectively.  This was impermissible under RFC's guidelines.  This loan did not meet RFC's

standards, was rated "unacceptable" by RFC's internal audit, and materially breached numerous representations and warranties by Provident to RFC, including a number of those identified in paragraphs 24 and 27 above.

e.   Loan ID #1911787 – Child support, alimony, and overtime income were included as part of the borrower's income without any documentation they were received.   As a result, the borrower's DTI was an impermissible 58%.  In addition, the appraisal for the subject property was based on dissimilar comps and inflated by 11%, resulting in a LTV ratio of 90%, which was not allowed under RFC's standards.  The loan defaulted shortly after origination, did not meet RFC's standards, and materially breached the representations and warranties made by Provident to RFC.

f.   Loan ID # 3320345 – The borrower on this $280,000 loan falsely represented that he was employed with a company that, in fact, did not exist.   In addition to the borrower's employment and income misrepresentations, RFC's internal audit determined the "[b]orrower is a 1st time homeowner who did not have the ability to repay based upon his limited credit."  The borrower on this loan also misrepresented his assets, provided a false bank address, and misrepresented that his bank account was opened three years earlier than it actually was.  RFC's internal quality audit determined the borrower was actually a "straw buyer."  Based on the above, this loan did not meet RFC's standards, was rated "unacceptable" by RFC's internal audit, and materially breached numerous representations and warranties by Provident to RFC.

g.   Loan ID # 4261026 – The borrower submitted a 30-day late payment on this loan before it was acquired by RFC, which is impermissible under the RFC product guidelines for this loan.   In addition, the LTV ratio for the loan was 87%, which violated the maximum LTV of 75% for this loan product.  The loan file also did not contain a verification of the borrower's employment.   For these reasons, the loan materially breached the representations and warranties made by Provident to RFC.

h.   Loan ID # 9467525 (included in securitization 2004-S8) – The borrower on this $432,000 loan ended his employment prior to the closing of the loan and its acquisition by RFC.  Not surprisingly, the loan defaulted shortly after origination.  This was deemed "unacceptable" under RFC's standards and constituted a material breach of the representations and warranties made by Provident to RFC.

    i.   Loan ID # 10368936 (included in securitization 2006-QS4) – The borrower on this $115,200 loan co-owned a company with the mortgage broker and the VOR signor for this loan.  In addition, there was no evidence supporting the existence of a company the borrower claimed to own.  Further, the borrower purchased 5 properties prior to the closing of the loan and did not disclose them.  This conduct was deemed "unacceptable" under RFC's standards and constituted material breaches of the representations and warranties Provident made to RFC.  Although the loan was eventually paid in full, it presented material risks to RFC and its inclusion in one of RFC's securitizations based on Provident's material misrepresentations contributed to RFC's liabilities and losses.

53.    The above examples are not intended to be an exhaustive list of the loans sold by Provident to RFC that contained material breaches of representations and warranties.  Rather, these loans represent a sampling of the material defects found in the loans Provident sold to RFC.  Many more of the loans sold to RFC by Provident contained material defects that violated the representations and warranties Provident made in the Agreement.  While Provident has, over the parties' course of dealing, repurchased some individual loans (thereby acknowledging it sold defective loans to RFC), it has in no way fully compensated RFC for the breaches of representations and warranties, liabilities, or losses stemming from the universe of defective loans Provident sold to RFC over time.

54.    As detailed below, these defects constituted material breaches of Defendant's representations and warranties, contributing to RFC's exposure to billions of dollars in liability and tens of millions of dollars in legal expenses.

**RFC's Liabilities and Losses Stemming from Defendant's Breaches**

55.     As a direct result of Defendant Provident's breaches, RFC has incurred obligations, liabilities, damages, and losses for which it is entitled to recovery from Provident.

56.     First, RFC has incurred billions of dollars in liabilities and losses stemming from defective loans, including those sold to RFC by Provident.

57.     In addition, RFC has expended tens of millions of dollars litigating the quality of the loans sold to it by Provident and others in extensive federal and state court litigation in which plaintiffs claimed the loans were rife with borrower or originator fraud, or failed to comply with applicable state and/or federal law.

58.     Beginning in 2008 and continuing until RFC filed for bankruptcy protection on May 14, 2012, RFC faced a growing number of claims and dozens of lawsuits stemming from the defective loans sold to it by Provident and others.

59.     For example, the RFC-sponsored RMBS offerings containing loans sold to RFC by Provident included a number of RMBS that became the subject of more than a dozen lawsuits brought by investors and other participants in the securitizations, alleging that as many as 98% of the loans contained in the RMBS offerings were defective in one or more ways.

60.     RFC ordinarily received a limited number of repurchase demands, primarily from whole loan investors.

61.     However, beginning in 2008, RFC began to receive increasing numbers of repurchase demands from bond insurers, whole loan purchasers, and RMBS trustees, including for loans RFC had acquired from Provident.

62.     In 2012, Deutsche Bank, a Trustee of numerous RMBS issued by RFC, for the first time made a repurchase demand to RFC.  Deutsche likewise alleged that the loans were defective in numerous ways.  Deutsche Bank likewise included Provident loans in its repurchase demand.

63.     Beginning in October 2008, RFC was sued in literally dozens of lawsuits stemming from allegedly defective mortgage loans, including those sold to it by Provident.

64.     One of the earliest lawsuits was a class action suit filed by the New Jersey Carpenters pension funds.  The New Jersey Carpenters' lawsuit purported to cover 59 mortgage-backed securities offerings issued through RFC's RALI shelf in 2006 and 2007, which consisted of first-lien Alt-A loans.  These securitizations were identified by names that included the letters "QA," "QH," "QO," and "QS."  As shown in Exhibit C, over 1,700 of Provident's loans were included in the offerings that were the subject of the New Jersey Carpenters' lawsuit.

65.     The New Jersey Carpenters' complaint alleged that 38% of the mortgage loans underlying the securitizations were in delinquency, default, foreclosure or repossession when New Jersey Carpenters filed its class action complaint, and that much of RFC's mortgage loan data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective

underwriting" described throughout the Complaint.  (NJ Carpenters First Am. Compl. ¶¶ 9, 110 in *New Jersey Carpenters et al. v. Residential Capital, LLC et al.* Case No. 08-cv-08781 (HB) (S.D.N.Y.).)  Of course, that data was provided to RFC—and represented and warranted to be accurate—by Provident and other correspondent lenders.

66.     On February 18, 2011, the Allstate Insurance Company and its various subsidiaries and affiliates sued RFC and numerous other defendants in Hennepin County District Court, Minnesota.  Allstate sued RFC about its role in some 23 securitizations.  These securitizations included RFMSI 2005-S8, RALI 2006-QS14, and RAMP 2006-RS3, which contained in the aggregate hundreds of loans sold by Provident to RFC.  Allstate supported its allegations in this complaint with a loan-level review of over 30,000 loans.  Allstate reviewed all loans in the RFMSI 2005-S8 offering and a sample of 800 defaulted loans and 800 loans tested at random in the RALI 2006-QS14 and RAMP 2006-RS3 offerings.  Allstate alleged that its review of these loans showed significant misstatements concerning borrower income, owner-occupancy and loan-to-value ratios, all of which under the Client Guide Provident was responsible for reviewing.

67.     Numerous other lawsuits followed on through RFC's bankruptcy filing in 2012, including over fifteen lawsuits brought by private investors in its RMBS securities, and more than a dozen lawsuits brought by monoline insurers.  By way of example:

   a.  The Federal Deposit Insurance Corporation filed suit against RFC based in part on defective loans included in RMBS offerings 2006-QS6, 2006-QS18, 2006-QS8, 2006-QS16, and 2007-QS5, which contained in the aggregate more than 120 Provident mortgage loans;

b.  The Federal Home Loan Bank of Boston, Chicago, and Indianapolis filed lawsuits against RFC based in part on defective loans included in RMBS offerings 2006-QA3, 2006-SA2, 2006-S4, 2007-QS6, 2007-S4, and 2007-SA4, which contained in the aggregate approximately 300 Provident mortgage loans;

c.  Huntington Bancshares filed suit against RFC based in part on defective loans included in RMBS offerings 2006-QS5, 2006-QS11 and 2006-QS13, which contained in the aggregate more than 325 Provident mortgage loans;

d.  Massachusetts Mutual Life Insurance Company filed a lawsuit against RFC based in part on defective loans included in RMBS offerings 2006-QA6, 2006-RS4, and 2006-RS6, which together included approximately 100 Provident mortgage loans;

e.  Thrivent Financial for Lutherans filed suit against RFC based in part on defective loans included in RMBS offerings 2004-QS16, 2005-QA7, and 2007-QS9, which contained in the aggregate more than 245 Provident mortgage loans

f.  The Union Central Life Insurance Company filed a lawsuit against RFC based in part on defective loans included in RMBS offerings 2005-QS14, 2005-QS2, 2006-QS6, and 2006-QS18, which contained more than 120 Provident mortgage loans;

g. The Western and Southern Life Insurance Company filed a lawsuit against RFC based in part on defective loans included in RMBS offerings 2005-QS16, 2006-QS3, 2006-QS6, and 2006-S2, which contained more than 500 Provident mortgage loans

68.     All of these lawsuits alleged that the loans RFC sold into RMBS securitizations were defective in a variety of ways, including borrower fraud, missing or inaccurate documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, or failure to comply with applicable state and federal law.

69.     Collectively, these lawsuits involved more than one hundred RMBS securitizations, and a combined original principal balance of more than $100 billion.

70.     Across the dozens of securitizations involved in these lawsuits, Provident was responsible for over 2,800 of the loans.

71.     As of May 2012, RFC had already repurchased millions of dollars worth of defective loans from its RMBS securitizations and from whole loan purchasers, either at the request of a bond insurer or trustee, or because RFC itself discovered a defect and affirmatively took steps to repurchase the loan.  As described in more detail above, these included numerous loans sold to RFC by Provident.

72.     In May 2012, RFC and certain of its affiliates—partly because of the enormous exposure stemming from the pending mortgage-related lawsuits described above—filed for Chapter 11 bankruptcy protection in the Bankruptcy Court for the Southern District of New York.

73.     In connection with the bankruptcy proceeding, hundreds of proofs of claim were filed by investors in RMBS, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation. These proofs of claim, many of which mirrored the litigation filed prior to the bankruptcy, sought damages in the tens of billions of dollars, all stemming from allegedly defective mortgage loans, including those sold to RFC by Provident.  By way of example, the following represents a small sampling of the hundreds of proofs of claim filed on the basis of defective loans:

    a. The indenture trustees for each of the RFC-sponsored securitizations (Deutsche Bank, Bank of New York, U.S. Bank, HSBC Bank, Law Trust and Wells Fargo, and Wells Fargo) collectively filed more than two dozen proofs of claim at the direction of two substantial groups of institutional investors.  The institutional investors collectively asserted that loan-level defects (including in the loans sold to RFC by Provident and securitized) were responsible for more than $19.5 billion in repurchase obligations.

    b. AIG, an investor in over 25 Debtor-sponsored securitizations (a number of which included Provident loans), filed five proofs of claim totaling in excess of $2.6 billion, based on the allegation that the loans were defective.  The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

    c. Allstate, an investor in 25 Debtor-sponsored securitizations (several of which included Provident loans), filed 20 proofs of claim based on the allegation that the loans were defective.  The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

    d. John Hancock, an investor in over 50 Debtor-sponsored securitizations (over a dozen of which included Provident loans), filed 43 proofs of claim asserting similar allegations.

74.     Many whole loan purchasers also filed proofs of claim in the bankruptcy proceedings, collectively seeking millions of dollars in recovery.

75.     These proofs of claim, lawsuits, and demands all alleged, among other things, that the securitized or purchased loans were defective, improperly underwritten, and breached representations and warranties made by RFC to investors, purchasers, and other contractual parties.  Those representations and warranties were, in most cases, identical to or less stringent than those that RFC had received from Provident, and on which RFC had relied.

76.     The Debtors initially proposed to settle portions of their RMBS-related liabilities for an aggregate $8.7 billion allowed claim in the bankruptcy case. Subsequently, after protracted litigation over the reasonableness and propriety of that settlement, the Bankruptcy Court appointed the Hon. James M. Peck, a United States Bankruptcy Judge for the Southern District of New York, to serve as a mediator and to attempt to achieve a negotiated resolution of the Debtors' RMBS-related liabilities and of other disputed issues in the chapter 11 cases.  A lengthy mediation process ensued, which, together with related proceedings, resulted in a global settlement that, among other things, provided for the resolution of all of the Debtors' RMBS-related liabilities for more than $10 billion in allowed claims granted to the various RMBS trusts, monoline insurers, FHFA, securities law claimants, and others.

77.     The Bankruptcy Court for the Southern District of New York ultimately approved the global settlement, including the $10 billion-plus settlement of RMBS-related liabilities, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the Plan.  (See Case No. 12-12020-MG, Doc. 6066 (Findings of Fact) (Glenn, J.), at ¶¶ 98 to 176.)  RFC filed this suit on December 13, 2013, after

RFC's RMBS-related liabilities became fixed through confirmation of the Plan.  The Plan became effective on December 17, 2013.  Pursuant to the Plan, the Trust succeeded to all of RFC's rights and interests, including its litigation claims against Provident.

78.     Pursuant to its express contractual obligations, Provident is obligated to compensate RFC for the portion of the global settlement associated with its breaches of representations and warranties, as well as for the portion of RFC's other liabilities and losses (including the tens of millions of dollars that RFC has paid in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans) associated with those breaches.

## COUNT ONE
### (BREACH OF CONTRACT)

79.     RFC realleges each and every allegation set forth in Paragraphs 1 through 78, above, as if fully rewritten herein.

80.     RFC and Defendant Provident entered into a valid and enforceable Agreement pursuant to which RFC acquired over 6,900 mortgage loans from Provident.

81.     Pursuant to the parties' Agreement, Provident made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans Defendant sold to RFC.

82.     RFC complied with all conditions precedent, if any, and all of its obligations under the Agreement.

83.    Defendant materially breached its representations and warranties to RFC inasmuch as the mortgage loans materially did not comply with the representations and warranties.

84.    Defendant's material breaches constitute Events of Default under the Agreement.

85.    RFC has suffered loss, harm, and financial exposure directly attributable to Defendant's material breaches, including liabilities and losses stemming from the defective loans, as well as attorneys' fees, litigation-related expenses, and other costs associated with both defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by Defendant, and fees and costs incurred in prosecuting this action.

86.    Accordingly, RFC is entitled to compensation in an amount to be proven at trial, which exceeds $75,000, together with an award of attorneys' fees, interest, and costs.

## COUNT TWO
## (INDEMNIFICATION)

87.    RFC realleges each and every allegation set forth in Paragraphs 1 through 86, above, as if fully rewritten herein.

88.    RFC has incurred substantial liabilities, losses and damages arising from and relating to material defects in the mortgage loans Provident sold to RFC, including over $10 billion in allowed claims approved by the United States Bankruptcy Court for the Southern District of New York, as well as tens of millions of dollars in attorneys'

fees, litigation-related expenses, and other costs associated with defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by Provident.

89.   Defendant expressly agreed to indemnify RFC for the liabilities, losses and damages, including attorneys' fees and costs, which RFC has incurred.

90.   Accordingly, RFC is entitled to indemnification in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs.

WHEREFORE, RFC demands judgment in its favor and against Defendant as follows:

(A)   On Count One (Breach of Contract), contractual repurchase compensation and/or damages in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(B)   On Count Two (Indemnification), a declaratory judgment that Defendant is responsible to indemnify RFC against liabilities, losses, expenses and/or other damages paid or to be paid in settlements or otherwise stemming from Defendant's conduct, an order for damages sufficient to reimburse RFC's liabilities, losses, costs and expenses caused by Defendant's actions in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(C)   All such further relief, as the Court deems necessary or proper.

Dated:  March 28, 2014

FELHABER LARSON

By:    s/Jessica J. Nelson
    Donald G. Heeman, #286023
    David L. Hashmall, #138162
    Jessica J. Nelson, #347358
    220 South Sixth Street, Suite 2200
    Minneapolis, MN  55402-4504
    Telephone:  (612) 339-6321
    Facsimile:  (612) 338-0535
    dheeman@felhaber.com
    dhashmall@felhaber.com
    jnelson@felhaber.com

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Peter E. Calamari (admitted pro hac vice)
51 Madison Avenue, 22nd Floor
New York, New York  10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
PeterCalamari@quinnemanuel.com

CARPENTER LIPPS & LELAND LLP
Jeffrey A. Lipps (admitted pro hac vice)
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone:  (614) 365-4100
Facsimile:  (614) 365-9145
lipps@CarpenterLipps.com

ATTORNEYS FOR PLAINTIFF
RESIDENTIAL FUNDING COMPANY,
LLC